# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| ASHLEE D. ALCOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:13-CV-01074-NKL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Before the Court is Plaintiff Ashlee Alcott's appeal of the Commissioner of Social Security's final decision denying her applications for Title II disability insurance benefits and Title XVI supplemental security income benefits. For the reasons set forth below, the Commissioner's decision is affirmed.

**I.  Background**

Alcott was born in January 1986, has a high school education and medical assistant education, and has prior work experience as a telephone order clerk, cashier, waitress, deli cutter, and hand packager. Alcott alleges she became disabled on July 1, 2008, due to the combined effects of bipolar disorder, attention deficit hyperactivity disorder (ADHD), anxiety disorder, panic disorder, agoraphobia, personality disorder, intermittent explosive disorder, and degenerative disc disease of the cervical spine. TR-184; Doc. 11, at p. 1.

Before discussing Plaintiff's alleged points of error, a brief discussion of Plaintiff's medical history is necessary. Plaintiff testified that in 2000 or 2001, when Plaintiff was 15 years old, she sustained neck injuries after she fell off the hood of a moving car in a parking lot. She testified that she has had ongoing pain in her neck since the accident. Plaintiff also testified that she has difficulty getting along with others and suffers from frequent panic attacks, depression, and difficulty concentrating.

### A. Medical History

#### 1. Mental Health Records

Intermittently from August 2007 to February 2012, Plaintiff presented to various care providers complaining of uncontrollable anger, high irritability, poor concentration, panic, low energy and fatigue, crying spells, racing thoughts, mood swings, flashbacks, guilt, stress, fear of failure, restlessness, nervousness, bad dreams, anxiety, depression, sadness, insomnia, and panic attacks. She was variably diagnosed with depression, bipolar disorder, ADHD, panic disorder without agoraphobia, anxiety disorder, intermittent explosive disorder, and personality disorder. She had global assessment functioning (GAF) scores ranging from 22 to 70.

In April 2008 and January 2009, she reported doing well on her medications and returned several times for refills. In December 2008, Plaintiff "self referred" herself for a psychiatric evaluation. TR-363. The psychiatrist observed that she was cooperative, aware of her problems and seeking help, appeared anxious, had a labile mood, and exhibited manic behavior. *Id.* Her cognitive functions were intact. *Id.* She had a GAF score of 45-50. *Id.*

In July 2010, Plaintiff presented to the emergency room complaining of anxiety and agitation. She returned two days later complaining of suicidal thoughts, agitation, and voices. TR-454. She was transferred to a psychiatric facility, where she stayed for approximately one week. TR-453. She was given a GAF score ranging from 22 to 50 and was diagnosed with bipolar disorder, anxiety disorder, degenerative disc disease, and seizure-like episodes. TR-470-75. She reported being off medications for the last year due to lack of health insurance. TR-489.

In October 2010, Dr. Martin Isenberg, a non-examining psychiatrist, completed a Psychiatric Review Technique. TR-519. He opined that Plaintiff had severe impairments, but that they were not expected to last twelve months. He noted that Plaintiff had diagnoses of bipolar disorder, ADHD, and panic disorder. TR-520, 522-23. He concluded Plaintiff had no more than mild limitations in activities of daily living, social functioning, and concentration, persistence, and pace, and had no repeated episodes of decompensation. TR-527.

In November 2011, Dr. Jane Ruedi examined Plaintiff for the purpose of a psychological evaluation. She completed a Medical Source Statement-Mental. TR-732. During her examination, Plaintiff stated she was able to take care of her six year old son, her personal needs and her home, was able to cook, and takes her laundry to the Laundromat. TR-731. She occasionally spends times with her friends, likes to spend time outdoors with her boyfriend, and scrapbooks. Dr. Ruedi remarked that Plaintiff's profile on the Minnesota Multi Phasic Personality Inventory-2 "was an invalid one, with an elevated F scale and severe 'fake bad' response set." TR-730. Dr. Ruedi opined the

Plaintiff appeared capable of interacting socially and adapting to her environment if it were a supportive one and was in a low stress setting. TR-731. Dr. Ruedi opined that Plaintiff would have moderate limitations in the ability to make judgments on complex work-related decisions and the ability to respond appropriately to usual work situations and to changes in routine. TR-732-33. No other limitations were present, but a low stress work environment was recommended. TR-733.

At Plaintiff's disability hearing in June 2012, Dr. Nancy Winfrey, a non-examining medical expert, testified as to Plaintiff's mental limitations after a review of her records up to November 2011. Dr. Winfrey observed from the record that after Plaintiff's alleged disability onset date, Plaintiff was able to take care of her small child and complete medical assistant training at a technical college, but had some difficulty managing money. TR-68. Dr. Winfrey opined Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning and maintaining concentration, persistence, and pace, and one episode of decompensation in July 2010. TR-68. Dr. Winfrey acknowledged that Plaintiff had ADHD diagnoses but opined that the diagnoses were by history only, meaning that physicians did not diagnose the disorder and instead relied on what Plaintiff told them. TR-69. Dr. Winfrey stated that support for an ADHD diagnosis was weak. *Id.* Dr. Winfrey stated Plaintiff could handle simple instructions and probably complicated instructions and recommended limited exposure to the public to prevent panic attacks. TR-70. In forming her opinion, Dr. Winfrey testified that review of Dr. Ruedi's report was helpful. TR-71. Dr. Winfrey also noted that the

4

week Plaintiff spent in the psychiatric facility in July 2010 was likely due to being off of her medication and was triggered by trauma. *Id.*

### 2. Physical Health Records

In November 2008, Plaintiff was examined for swelling in her neck. TR-246. She complained of tightness and stated that her neck had not bothered her for the past one and one half years. TR-246. Upon examination, Plaintiff struggled to rotate her neck and exhibited tenderness and tightness. TR-247. From January to June 2009, Plaintiff presented to multiple healthcare providers and complained of neck pain, spasms, and decreased range of motion. TR-772-85. In March 2009, an MRI of her cervical spine revealed reversed lordosis in the mid-cervical spine and mild posterior bulging of the intervertebral discs with mild central canal narrowing. TR-790. In November 2009, Plaintiff went to the emergency room complaining of burning neck pain. She had decreased range of motion and was thought to have cervical radiculopathy. TR-311-12. In February 2010, Plaintiff went to the emergency room after she thought she suffered a seizure. TR-768. In July 2010, Plaintiff went to the emergency room after experiencing a seizure due to benzodiazepine withdrawal. TR-435.

In December 2011, Dr. John Bleazard examined Plaintiff for Missouri Disability Determinations and completed a Medical Source Statement-Physical. An examination of Plaintiff's upper and lower extremities was normal. Her cervical spine was tender to palpation, but no functional limitation was observed. TR-744. He noted mild diminished range of motion in her cervical spine. Dr. Bleazard opined Plaintiff could sit, stand, and walk for 6 out of 8 hours per day with periodic alternating. She was limited to lifting 25

5

pounds occasionally and could carry no more than 20 pounds occasionally for short distances or 10 pounds frequently.  TR-745.

   B. **ALJ's Decision**

After a hearing, an administrative law judge (ALJ) determined Plaintiff had the following severe impairments: mild degenerative disc disease of the cervical spine, bipolar I disorder, panic disorder, personality disorder, NOS, and polysubstance abuse. TR-22.  Plaintiff's diagnoses of ADHD and intermittent explosive disorder were not severe because Dr. Winfrey opined that there was little support in the record for these diagnoses, and the ADHD diagnoses were self-reported.  *Id.*

The ALJ determined that Plaintiff has the residual functional capacity (RFC) to lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently.  She can stand, walk, and sit for 6 hours out of an 8 hour day.  She can occasionally climb ramps and stairs and crawl, but should avoid climbing ladders, ropes, or scaffolds, looking above the horizon, and reaching overhead.  She is able to follow simple and detailed instructions to perform unskilled and semiskilled work.  She is limited to superficial interaction with the public.  TR-24.  With the assistance of a vocational expert (VE), the ALJ determined Plaintiff could perform her past relevant work as a telephone order clerk and a deli cutter/slicer. TR-32.  Alternatively, Plaintiff could perform other work that existed in significant numbers in the national economy, including linen supply loan builder, garment sorter, laundry sorter, lens inserter, surveillance-system monitor, and eyeglass frame polisher.  TR-34-35.

In reaching his decision the ALJ considered Plaintiff's medical records, her activities of daily living, her ability to complete medical assistant training, which included 265 hours of on-the-job training, her testimony that she looked for jobs after her alleged disability onset date, and her testimony that she worked for 6 weeks in late 2009 and early 2010. TR-25-26. The ALJ also gave "significant weight" to the opinions of Dr. Winfrey and Dr. Bleazard. TR-28. The ALJ noted that Plaintiff's primary care physician encouraged her to apply for jobs and to go to nursing school. TR-31.

## II. Discussion

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law. In this substantial-evidence determination, the entire administrative record is considered but the evidence is not reweighed. Substantial evidence is less than preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). So long as the Commissioner's decision is supported by substantial evidence, the Court will not reverse even if the Court would reach a different conclusion or if substantial evidence also supports a contrary conclusion. *Id.*

Plaintiff alleges several points of error with the ALJ's formation of her RFC and with the ALJ's conclusion that she is capable of performing past relevant work or other work that exists in significant numbers in the national economy. As discussed below, each of these points of error is unpersuasive.

### A. Weight Given to Medical Opinions in the Record

Plaintiff first argues that the ALJ erred by failing to identify the weight, if any, given to Dr. Isenberg's and Dr. Ruedi's opinions. When state agency medical and psychological consultants and other program physicians render opinions in a case, the ALJ must consider and evaluate these opinions when making a decision. SSR 96-6P, 1996 WL 374180 at *2 (1996). An ALJ is not bound by findings made by a state agency physician or psychologist, but he may not ignore these opinions and must explain the weight given to the opinions in his decision. *Id.* The Commissioner concedes that the ALJ does not specifically discuss or assign a weight to the opinions of Dr. Isenberg and Dr. Ruedi. However, the Commissioner argues the error is harmless because Dr. Isenberg imposed less restrictive limitations that the ALJ adopted and because Dr. Ruedi's opinion, which was cited but not explained in the ALJ's decision, was reviewed and relied on by Dr. Winfrey and was not more restrictive than the limitations imposed by the ALJ. After a review of the opinions, the Court agrees.

Dr. Isenberg, a non-examining psychiatrist, opined that Plaintiff had severe impairments, but that they were not expected to last twelve months. He concluded Plaintiff had no more than mild limitations in activities of daily living, social functioning, and concentration, persistence, and pace, and had no repeated episodes of decompensation. TR-527. Contrary to Dr. Isenberg's opinion, the ALJ concluded that Plaintiff did have severe impairments that would last longer than twelve months, had moderate limitations in social functioning and in maintaining concentration, persistence, and pace, and experienced one episode of decompensation. TR-22-23. So while it is true that the ALJ did not explicitly assign a weight to Dr. Isenberg's opinion, it is clear from

the ALJ's RFC assessment that not much weight, if any, was given to the opinion because the ALJ found greater limitations than Dr. Isenberg recommended.

Dr. Ruedi opined that Plaintiff appeared capable of interacting socially and adapting to her environment if it were a supportive and low-stress one, that Plaintiff was moderately limited in her ability to make judgments on complex work-related decisions and her ability to respond appropriately to usual work situations and changes, and that no other limitations were present. TR-731-33. As to Plaintiff's ability to respond to work situations and Dr. Ruedi's recommendation of a low-stress environment, Dr. Winfrey, who testified that she found Dr. Ruedi's report helpful, stated that Plaintiff would benefit from limited interaction with the public, which the ALJ incorporated by restricting Plaintiff to superficial interaction with the public. As to Plaintiff's ability to make complex decisions, the ALJ limited her to unskilled and semi-skilled work. TR-24. The ALJ's RFC is largely consistent with Dr. Ruedi's opinion, and aside from arguing that the ALJ should have incorporated a low-stress restriction in the RFC – which was arguably addressed by a superficial public interaction restriction – Plaintiff does not point to any portion of Dr. Ruedi's opinion that is more restrictive than the RFC. Therefore, remand is not necessary to determine an explicit weight given to her opinion, and any error in failing to discuss a specific weight is harmless. *See MacCadney v. Astrue*, 519 F.3d 764, 767 (8th Cir. 2008) (remanding when it was unclear what weight, if any, was assigned to consultative physician's opinion which included diagnoses and further restrictions that were not incorporated in the RFC or hypotheticals to the VE).

    **B. Reliance on the Opinion of Dr. Winfrey**

Plaintiff next argues that the ALJ erred by relying on the opinion of Dr. Winfrey, a non-examining medical consultant, in forming Plaintiff's RFC, because the opinion of a non-examining consultant does not constitute substantial evidence in the record. "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations. . . . Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (quotation and citation omitted). "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

The ALJ agreed with Dr. Winfrey's testimony and opinion about Plaintiff's mental functioning ability and assigned her opinion "significant weight" because it was consistent with Plaintiff's treatment records and compatible with the totality of the evidence. TR-28. While reliance on Dr. Winfrey's opinion alone would not constitute substantial evidence in the record, the ALJ relied on more than just Dr. Winfrey's opinion in forming the mental component of Plaintiff's RFC. *See Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004) ("It is true that we do not consider the opinions of non-examining, consulting physicians standing alone to be 'substantial evidence.' However, the ALJ in this case did not rely solely on Dr. Kahn's opinion to reach his conclusions. Rather, the ALJ relied on Dr. Kahn's opinion as one part of the record, which, as a whole and as described above, clearly provides substantial support for his findings.") (internal

citations omitted). For example, the ALJ cited Plaintiff's medical records, her ability to complete medical assistant training, which included 265 hours of on-the-job training, her testimony that she looked for work after her alleged onset date, evidence that she worked for six weeks as a housekeeper, and evidence of her activities of daily living, which included caring for a small child, taking care of her home, and spending time outdoors with her boyfriend. TR-28, 30-31; *see also Henderson v. Barnhart*, 202 Fed. Appx. 147, 148 (8th Cir. 2006) (noting that the claimant offered no RFC statement from a treating physician, although it was his burden to establish RFC). Accordingly, the ALJ did not err in relying in part on Dr. Winfrey's opinion.

Plaintiff also argues Dr. Winfrey's testimony directly conflicted with the record because Dr. Winfrey "opined there to be no diagnosis of ADHD in the record and reported it was only diagnosed as a historical diagnosis" but that a treating professional and state agency consultant diagnosed ADHD. Doc. 11, at p. 19. However, in her testimony, Dr. Winfrey acknowledged that there were diagnoses of ADHD, but opined that the diagnoses were by history only, meaning that Plaintiff told her physicians she suffered from ADHD, but that her physicians did not independently test for and diagnose it. TR-68-69. Dr. Winfrey stated the support for the diagnosis was "weak" and that it "has not been a focus for treatment." TR-69. Indeed, Plaintiff's treating physician, before diagnosing ADHD, stated that Plaintiff's "[m]om thinks she's been ADHD for her entire life." TR-276. Plaintiff also points to Dr. Isenberg's Psychiatric Review Technique, which lists ADHD as an impairment. However, even acknowledging this diagnosis, Dr. Isenberg opined that Plaintiff had less functional restrictions than what the

11

ALJ concluded. Therefore, Dr. Winfrey's conclusion that little evidence supported ADHD as an impairment is supported by the record.

## C. Failure to Consider Plaintiff's GAF Score History

Plaintiff next argues that contrary to the ALJ's statement that no opinions from her treating physicians were in the record, GAF scores contained in her medical records constitute an opinion that Plaintiff had a serious impairment in social, occupational, or school functioning. Doc. 11, at p. 20. While it is true that the record includes GAF score assessments as low as 22 and typically around the 50 mark, failure to consider these scores is not reversible error.

The Eighth Circuit, citing the DSM-IV, has previously stated that GAF scores below 50 are an indication of serious symptoms and a serious limitation on a claimant's ability to perform basic life tasks. *See Pate-Fires v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009). However, the DSM-V, released in 2013 and replacing the DSM-IV cited by the Eighth Circuit, no longer uses GAF scores to rate an individual's level of functioning because of "its conceptual lack of clarity" and "questionable psychometrics in routine practice." *See Rayford v. Shinseki*, 2013 WL 3153981, at *1 n. 2 (Vet. App. 2013) (quoting the DSM-V). Further, as the ALJ remarks in his opinion, other evidence in the record is inconsistent with a GAF score indicating serious limitations on the ability to function. *See Wright v. Astrue*, 489 Fed. Appx. 147, 149 (8th Cir. 2012) (failure to discuss GAF scores did not require reversal given ALJ's comprehensive analysis of the medical evidence, the infrequency of the GAF scores, the range of the GAF scores, the claimant's conflicting activities, and the conflicting medical evidence); *Jones v. Astrue*,

619 F.3d 963, 973-74 (8th Cir. 2010). For instance, Plaintiff testified she was able to complete medical assistant training, take care of herself and her home, and take care of her young son. The ALJ also noted that one of Plaintiff's treating physicians – albeit one addressing her neck pain and not her mental limitations – encouraged her to apply for jobs and to go to nursing school. TR-30-31, 774. Accordingly, the DSM-V's rejection of the GAF assessment aside, substantial evidence in the record supports a rejection of the GAF scores and a failure to discuss them is harmless error.

### D. Determination that Plaintiff Could Perform Past Relevant Work

At Step 4 of the disability analysis, the ALJ determined Plaintiff could perform past relevant work as a telephone order clerk and a deli cutter/slicer. Plaintiff argues this determination is reversible error because the jobs are inconsistent with Plaintiff's RFC and because the ALJ failed to make specific findings as to the physical and mental demands of Plaintiff's past work. Doc. 11, at p. 21-23.

#### 1. Telephone Order Clerk

Plaintiff argues that she cannot perform the job of a telephone order clerk because a "significant" portion of the job requires dealing with people, and this is inconsistent with the ALJ's RFC, which prescribes only superficial interaction with the public. The *Dictionary of Occupational Titles* states that a telephone order clerk will be required to perform "significant" "speaking-signaling." DICOT 249.362-026, 1991 WL 672320. However, while the job title allows for in-person interaction or interaction by phone or mail, the VE and the ALJ limited Plaintiff to performing this job over the phone, which is consistent with the Plaintiff's limitation of superficial interaction with the public.

13

Plaintiff also points out that the VE eliminated the job of a call out operator because it would involve contact with the public by telephone and argues that exclusion of a call out operator but not a telephone order clerk is inconsistent because both involve telephonic communication with the public. However, upon inspection of the record, the VE eliminated the job of a call out operator only after the ALJ posed a new hypothetical which required total avoidance of public interaction. TR-85-86. This hypothetical was not adopted as the RFC. Therefore, the VE's testimony is not inconsistent.

### 2. Deli Cutter/Slicer

Regardless of whether a telephone order clerk would require more than superficial interaction with the public, the ALJ also concluded Plaintiff could perform past relevant work as a deli cutter/slicer. Plaintiff argues she cannot perform her past work as a deli cutter/slicer because the job requires exposure to "other environmental conditions" which is defined as "an environmental factor rating in the [*Selected Characteristics of Occupations* (*SOC*)] used to capture uncategorized environmental conditions." Citing examples within the *SOC*, Plaintiff argues "other environmental conditions" includes "demolishing parts of buildings to reach and combat fires and rescue persons," "mining ore or coal underground," "patrolling assigned beat to prevent crime," "diving in the ocean," and "patrolling ski slopes." She contends and that given her severe impairments, she could not be exposed to these "other environmental conditions." This argument is without merit. Surely Plaintiff does not believe that performing her job as a meat cutter/slicer will require her to do any of the tasks described above. Plaintiff testified that her job was "to utilize the meat slicer to slice meat for customers" and that she "made

14

pastas," "waited on customers," and "[p]retty much, that's it." TR-47. Further, "other environmental conditions" is defined as environmental conditions not otherwise defined, which could mean any number of conditions other than exposure to weather, extreme heat or cold, wetness or humidity, noise, vibration, atmospheric conditions, moving mechanical parts, electrical shock, high, exposed places, radiation, explosives, or caustic chemicals, which are the defined conditions in the *SOC*. Appendix D. Environmental Conditions, SCODICOT. The ALJ did not err in concluding Plaintiff could perform past relevant work as a meat cutter/slicer.

### 3. Failure to Make Specific Findings as to Physical and Mental Demands

Plaintiff also contends that the ALJ erred by failing to make specific findings as to the physical and mental demands of her past relevant work. At Step 4, the ALJ must make explicit findings regarding the actual physical and mental demands of the claimant's past work. *Pfitzner v. Apfel*, 169 F.3d 566, 569 (8th Cir. 1999). "The ALJ may discharge this duty by referring to the specific job descriptions in the *Dictionary of Occupational Titles* that are associated with the claimant's past work." *Id.* While the ALJ did not specifically discuss the mental and physical demands of Plaintiff's past work as a telephone order clerk and deli cutter/slicer, the ALJ specifically referenced the job descriptions as defined in the *Dictionary of Occupational Titles*. The ALJ stated the telephone order clerk job description could be found at "DOT no. 249.362-026" and the deli cutter/slicer job description could be found at "DOT no. 316.684-014." TR-32. The VE also referred to these descriptions in her testimony. TR-82-83. Therefore, the ALJ did not err by failing to explicitly discuss the demands of Plaintiff's past work.

15

### E. Determination that Plaintiff Could Perform Other Work

Even if the ALJ erred in concluding Plaintiff could perform past relevant work at Step 4, the ALJ alternatively concluded at Step 5 that Plaintiff could perform other work including a linen supply load builder, garment sorter, laundry sorter, lens inserter, surveillance-system monitor, and eyeglass frame polisher. TR-34-35. Plaintiff argues the VE's testimony concerning her ability to perform these jobs is inconsistent with the *Dictionary of Occupational Titles* and Plaintiff's RFC, and therefore, the ALJ's reliance on the VE's testimony is reversible error. Doc. 11, at p. 23.

#### 1. Constant versus Frequent Reaching and Overhead Reaching

Plaintiff contends the ALJ's determination that Plaintiff could perform work as a linen supply loader was erroneous because Dr. Bleazard, whose opinion was given "significant weight," opined that Plaintiff was limited to frequent reaching and handling and moderate noise levels, and the job of linen supply loader requires constant reaching and handling and loud noise levels. However, the ALJ did not include any reaching, handling, or noise restrictions in Plaintiff's RFC other than that she must avoid reaching overhead, TR-24, and Plaintiff did not challenge this portion of the RFC determination in her brief. The VE's determination that Plaintiff could constantly reach and handle and work in a loud noise environment is consistent with the RFC.

Plaintiff also contends that she cannot perform the jobs of linen supply load builder, garment sorter, laundry sorter, lens inserter, and eye glass frame polisher because they require frequent to constant reaching. Plaintiff argues "reaching" is defined as extending the hands and arms in any direction, which includes overhead reaching – a

function the ALJ determined she should avoid. However, the broad definition of "reaching," which may include overhead reaching, does not mean the jobs necessarily require any overhead reaching. *See Crane v. Colvin*, 2014 WL 460858, at *6 (W.D. Mo. 2013) ("Plaintiff's argument overlooks the fact that the RFC determination only limited Plaintiff's ability to reach overhead; it placed no restrictions on Plaintiff's ability to perform other types of reaching."); *Segovia v. Astrue*, 226 Fed. Appx. 801, 804 (10th Cir. 2007) ("The *SCO* does not separately classify overhead reaching. Thus, under the *SCO*, even a job requiring frequent reaching does not necessarily require more than occasional overhead reaching."); *Seaman v. Astrue*, 364 Fed. Appx. 243, 249 (7th Cir. 2010). Further, it is clear from the testimony that the VE was aware of the overhead reaching restriction when she gave her opinion, and there is no reason to believe the restriction was not considered when the VE listed jobs Plaintiff could perform. *See* TR-85 (VE: "That involves frequent reaching, handling, and fingering. And would that be acceptable in your hypothetical?"; ALJ: "It would as long as it's not overhead."; VE: "It isn't overhead."). The VE's testimony is consistent with Plaintiff's RFC and the *Dictionary of Occupational Titles*, and therefore, the ALJ did not err by relying on the VE's testimony.

### 2. Superficial Interaction with the Public

Plaintiff also asserts she cannot perform the job of a surveillance-system monitor because the job requires "significant" speaking and signaling of people and dealing with people. *See* DICOT 379.367-010. However, the ALJ limited Plaintiff's interaction with the public only and not with coworkers. The *Dictionary of Occupational Titles*, 379.367-010, describes the job of surveillance-system monitor as using closed circuit television

monitors to monitor premises of public transportation to detect crimes. Required communication includes "notifying authorities by telephone of need for corrective action." *Id.* This could include communication with police or another designated agency. Nothing in the job description for surveillance-system monitor includes interaction with the public. Therefore, the VE's testimony that Plaintiff could perform this job is consistent with the RFC, and the ALJ's reliance on the VE's testimony is therefore supported by substantial evidence.

### III. Conclusion

The ALJ's decision is supported by substantial evidence in the record. Accordingly, the Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: September 17, 2014
Jefferson City, Missouri